MONTGOMERY LAW GROUP
Bradley R. Flynn, Esq.
PA Bar ID: 332730
1420 Locust Street, Suite 420
Philadelphia, PA 19012
Phone: 215-650-7563
Bradley@ed-law.com

**IN THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Jeffery Cupitt, Individually, | : | |
| *Plaintiffs*, | : | |
| | : | Case No. 2:25-cv-00324 |
| V. | : | |
| | : | |
| The Philadelphia College of , | : | JURY TRIAL DEMAND |
| Osteopathic Medicine | : | |
| *Defendant*. | : | CIVIL ACTION-LAW |
| | : | |
| | : | |

**VERIFIED COMPLAINT**

Plaintiff by and through their undersigned attorneys, brings this Complaint against the above-named Defendants, agents, and successors in office, to safeguard their rights under the United States Constitution, State, and Federal law, and in support thereof allege the following:

**PRELIMINARY STATEMENT**

1. Mr. Jeffery Cupitt was a student in attendance at the Philadelphia College of Osteopathic Medicine ("PCOM," the "University," or the "Defendant"), where he was a student in the University's graduate Educational Specialist ("Ed.S.") program for school psychology.

2. As set forth below, the University has since dismissed Mr. Cupitt from the program in April 2024, after subjecting him to disability-based, racial, and religious discrimination.

1

3. Mr. Cupitt is diagnosed, *inter alia*, with narcolepsy.

4. Mr. Cupitt is a Black student and he is also a Muslim.

5. During his time at the University, Mr. Cupitt participated in two internships with local school districts. From August 2023 until February 2024, the first school district, Brandywine, subjected Mr. Cupitt to racial and religious discrimination when it excluded him from interning in its District based on Mr. Cupitt wearing a turban. On numerous occasions, the Brandywine District sent, or threatened to send, Mr. Cupitt home for wearing a turban. After he asked permission to wear the turban, it reported him to PCOM for alleged "unprofessional" behavior.

6. The Brandywine District refused to accommodate Mr. Cupitt's disabilities.

7. Rather than assisting Mr. Cupitt or investigating the allegations, PCOM, instead, took steps to remove Mr. Cupitt from the graduate program, which, in part, was based on wearing a turban.

8. Cupitt subsequently interned in Colonial School District in Delaware. Colonial refused to accommodate his narcolepsy disability. It then took steps to remove Mr. Cupitt from the internship because he was late by two or three minutes on a few occasions, due to his narcolepsy.

9. Rather than working to accommodate Mr. Cupitt, Colonial informed the University that he "was unprofessional." In other words, Colonial alleged that the manifestations of his disability were unprofessional.

10. PCOM subsequently, upon information and belief, used narcolepsy-based lateness as an additional pretextual basis to justify removing him from the internship.

11. Notably, the University did nothing to intervene when Mr. Cupitt reported the racial, religious, and disability-based discrimination at his internships. Instead of ensuring that he had access to these programs, the University elected to remove Mr. Cupitt from his graduate program.

12. PCOM has subjected Mr. Cupitt to invidious, racial discrimination based on prejudicial stereotypes about Black students; and about the fact that he wears clothing that are common among Black men who are practicing Muslims, which includes a turban.

13. Upon information and belief, the University's allegations that Mr. Cupitt did not act "professionally" meant that he did not act "white."

14. Throughout the time Mr. Cupitt attended the University, security officers profiled him and asked him "what he was doing" when he simply was attempting to go to school.

15. The University staff also made racially-hostile remarks to him regarding monkeypox: "The pox vaccines are upstairs."

16. In February 2024, the University informed Mr. Cupitt that it would be dismissing him from the program. After exhausting the appeal process, the University indicated that it was dismissing Mr. Cupitt in April 2024.

17. Pursuant to the University's reinstatement policy, Mr. Cupitt attempted to work with the University to develop a corrective action plan, so that he could resume completing his degree.

18. Though Mr. Cupitt believes that there is no basis for him to need to remediate, he has agreed to do so in good faith and to avoid unnecessary delay in completing his final internship.

19. The University, however, refuses to work with Mr. Cupitt to complete the reinstatement process.

20. Because the University refuses to work with him on the reinstatement plan, Mr. Cupitt has no way to complete his **final** degree **requirements**, which **are** the internships. In other words, he merely needs to complete these internships and he would be able to graduate.

21. PCOM was willing to take Mr. Cupitt's tuition money, while allowing him to wrack up debt through student loans, and allowing him to get to the final semester before it removed him from the program.

22. The Defendants' conduct is the source of Mr. Cupitt's injuries.

## JURISDICTION AND VENUE

23. This court has jurisdiction under 28 U.S.C. §1331, as the causes of action contained herein invoke federal question jurisdiction, as Plaintiffs bring claims arising under federal law.

24. This court has supplemental jurisdiction over the Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

25. Venue for this action properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) because the events that give rise to the claims in this action occurred in this District.

## PARTIES

**Plaintiffs:**

26. Plaintiff Jeffery Cupitt is an adult individual who resides at 6136 N. 10th Street, Philadelphia, PA.

**Defendant:**

27. The Defendant University is believed to be doing business at 4170 City Avenue Philadelphia, PA 19131.

## FACTUAL ALLEGATIONS

28. Cupitt was previously a student in attendance at the University where he was a student in its graduate ED.S. program for school psychology.

29. Prior to dismissing Mr. Cupitt from the University in April 2024, he had completed all of his course work, except for one internship. Throughout the time he was enrolled, his GPA was 3.5 and his transcript was bereft of any disciplinary notations.

30. Mr. Cupitt is Black. He is also a Muslim.

31. As a part of Mr. Cupitt's sincerely held religious beliefs, he wears a turban.

32. For Mr. Cupitt, wearing a turban is both a part of his sincerely held religious beliefs and an expression of Black culture.

33. Mr. Cupitt is diagnosed, *inter alia*, with narcolepsy.

34. The narcolepsy does not interfere with the functioning of the program and Mr. Cupitt's ability to meaningfully participate in it. He notes that he has only been late on a handful of occasions because of this disability. He has since started working with medical professionals to ensure that this does not happen in the future.

35. Though he has requested on several occasions that the University work with him to develop disability accommodations, it refuses to do so. Specifically, Mr. Cupitt requested modifications to the attendance rules to relax these policies to accommodate for his narcolepsy in the form of a Section 504 plan or a similar support plan. Such an accommodation would have allowed for Mr. Cupitt to overcome minor latenesses, which

are due to his narcolepsy. Flexibility with arrival times is a standard accommodation for students with this disability.

36. A 504 plan is an agreement between the University and a student to accommodate their disabilities pursuant to Section 504 of the Rehabilitation Act of 1973, so that they can access their education equal to that of their non-disabled peers.

37. On at least three occasions, during the period that spanned from October 2022 until December 2023, Mr. Cupitt attempted to work with the University to develop disability accommodations. On each of the occasions, it refused to engage in an interactive process to develop accommodations. Furthermore, because it refused to engage in an interactive process, it failed to develop accommodations for him.

38. Since Mr. Cupitt began attending PCOM, campus security frequently stopped Mr. Cupitt to ask him what he was doing. Mr. Cupitt notes that he was simply walking to class or that he was accessing other campus facilities. Security frequently stops him to ask what he is doing and they treat him with suspicion.

39. Campus security would often ask him what he "is doing on campus." Mr. Cupitt understood their questioning to signify that he was unwelcome as a Black student and that they perceived his blackness as being equated with being a criminal. This invidious treatment signified to Mr. Cupitt that he was in no way associated with PCOM academically as a student of color.

40. Mr. Cupitt has asked his white classmates if they were frequently stopped by campus security. They indicated that they are never stopped.

41. Prior to the dismissal, campus security frequently stopped Mr. Cupitt to question him. In other words, University security officers profiled Mr. Cupitt up until around March 2024.

6

Mr. Cupitt reports that he was profiled the entire time he was in attendance at the University, from the Summer 2021 through March 2024.

42. On other occasions, security has interrogated Mr. Cupitt about why he wanted to use the University's fitness center. He was simply trying to access the fitness center the same as his white counterparts.

43. During the fall 2022 semester, a staff member at the University was handing out Phillies tickets to the students. When Mr. Cupitt walked by, the staff member said to him, the "pox vaccine is upstairs." Around this time, there was a global monkeypox outbreak, which originated in Africa. Monkeypox was a frequent discussion in the news around the time that this comment was made. Mr. Cupitt interpreted this comment to be based on negative stereotypes about persons of African descent having communicable diseases. In addition, he understood the reference to monkeypox as equating him with the racial slur, monkey. Again, this pattern of invidious treatment signified to Mr. Cupitt that Black Muslim students will never be a part of PCOM; that Black students do not attend graduate school in this institution.

44. Later that same day, Mr. Cupitt attended a Phillies game and was seated in a section that was for PCOM students and faculty. Approximately five minutes after he was seated, University staff approached Mr. Cupitt and told him that "seats are for PCOM students." It is notable that Mr. Cupitt was the only Black PCOM student in attendance at the game.

45. In February 2024, Mr. Cupitt requested a member of the diversity department to attend the SPEC meetings.[1] The diversity department never responded to his requests and never sent anyone to his meetings. Mr. Cupitt specifically requested that someone from this

---

[1] SPEC meetings are conferences that the student evaluation and performance committee convenes.

department attend, as he felt discriminated against on the basis of his race. He was hopeful that having such staff present would help to make the meetings more equitable.

46. Starting in August 2023, Mr. Cupitt participated in an internship in the Brandywine School District in Delaware. Throughout the time Mr. Cupitt participated in the internship, Brandywine administrators demanded that Mr. Cupitt remove his turban.

47. On several occasions, Brandywine told Mr. Cupitt to leave school property because he was wearing a turban. In other words, Brandywine was excluding Mr. Cupitt from his internship and from accessing its school buildings on the basis of his religious expression.

48. When Mr. Cupitt requested permission to wear the turban as a part of his religious and cultural expression; the Brandywine District accused him of "not being responsive to feedback."

49. The Brandywine District then told the University that Mr. Cupitt was "not being responsive to feedback" and that he was "being unprofessional."

50. When Mr. Cupitt informed the University that the issue was not his professionalism, but, rather, that Brandywine was discriminating against him on the basis of his religion and race, the University refused to assist him or to investigate.

51. Instead, the University backed the Brandywine District. More specifically, upon information and belief, the University would later use Brandywine's offensive allegations as a pretextual justification to dismiss Mr. Cupitt from its program.

52. In the middle of February 2024, he was dismissed from his internship at the Brandywine School District in Delaware. The Brandywine School District dismissed Mr. Cupitt because he was wearing his turban. Again, the turban is both an aspect of Mr. Cupitt's faith and Black culture.

53. In the two weeks that followed the dismissal from the internship, the University refused to assign Mr. Cupitt to a new internship. As a result, he was unable to participate in the internship and to receive academic credit.

54. The University also failed to take steps to ensure that he would be able to participate in the internship at Brandywine free from racial and religious discrimination.

55. Because the University refused to help Mr. Cupitt secure an internship, he was left scrambling to find one. At the end of February 2024, Mr. Cupitt secured an internship at the Colonial School District, which is located in Delaware.

56. Mr. Cupitt concedes that he was late on a few occasions to this internship by about two to three minutes. He attributes this lateness to the fact that he has narcolepsy. Despite informing the Colonial District about this disability, it reported him to the University for being late and similar allegations.

57. Colonial refused to take any steps to accommodate Mr. Cupitt's disability. Though Mr. Cupitt asked the University to intervene with securing accommodations at the school district, it refused to do so.

58. In February 2024, the University informed Mr. Cupitt that it would be dismissing him from the program.

59. Mr. Cupitt appealed the dismissal on March 22, 2024, to get reinstated into the program.

60. In April 2024, the University denied his appeal. It informed him, however, that he could seek reinstatement through the University's reinstatement process. Part of this process involved meeting with staff and developing a corrective action plan.

61. Developing the corrective action plan is a collaborative process. It involves meeting with staff, proposing a plan to the University, receiving feedback from the University on the

proposed plan, and working with the University to ensure that the student successfully completes the plan.

62. Though Mr. Cupitt believes that he did not require a corrective action plan, as his dismissal was based on racial and disability-based discrimination, he, nonetheless, agreed to complete the plan in good faith.

63. In May 2024, Mr. Cupitt submitted a proposed corrective action and reinstatement plan to the University, per its policies.

64. Throughout May, June, and July 2024, Mr. Cupitt has reached out to the University on numerous occasions about setting up meetings to discuss the proposed plan and for feedback on it. The University refuses to respond to him and it refuses to set up a meeting.

65. Because the University refuses to meet with him and to work with him to develop the plan, he has no way to be reinstated. The University is now delaying and/or denying his reentry into the program based on its failure to engage in the process with him.

66. Part of Mr. Cupitt's proposed plan for reinstatement included treating with medical professionals to address the narcolepsy. The University refused to work with Mr. Cupitt on this plan, including allowing him to be reinstated after treatment with medical professionals.

67. The University's refusal to work with Mr. Cupitt shows the extent to which it has been deliberately indifferent to accommodating his disabilities.

68. The Defendants' discrimination and conduct is the direct and proximate cause of Mr. Cupitt's harm.

69. This civil complaint now follows.

## Count 1
### DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT--DENIED THE BENEFITS OF EDUCATIONAL SERVICES BY REASON OF DISABILITY
*Jeffery Cupitt v. Philadelphia College of Osteopathic Medicine*

70. Mr. Cupitt hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

71. The Americans with Disabilities Act ("ADA") prohibits discrimination against qualified individuals with disabilities on the basis of their disability. 42 U.S.C. §§ 12161, 12132. To establish a claim under the ADA, a plaintiff must demonstrate that: (1) he has a disability, or was regarded as having a disability; (2) he was "otherwise qualified" to participate in school activities; and (3) he was "denied the benefits of the program or was otherwise subject to discrimination because of her disability." *A.G. v. Lower Merion Sch. Dist.*, 542 F. App'x 193, 198 (3d Cir. 2013).

72. The Defendant University discriminated against, and denied Mr. Cupitt the benefits to his program, under the Americans with Disabilities Act:

    a. The Plaintiff is recognized as a person with disabilities, which includes, *inter alia*, narcolepsy.

    b. Upon information and belief, the University is a federal funds recipient and its buildings and facilities are places of public accommodation.

    c. Mr. Cupitt is otherwise qualified to participate in the program.

    d. The Defendant University denied Mr. Cupitt the benefits of his program in several ways, as set forth in ¶¶ 35-37; 56-68.

    e. This discrimination not only included, *inter alia*, the failure to work with Mr. Cupitt to develop an accommodation plan, it also included the University

11

  expelling him from the program and refusing to work with him on a remediation plan, so that he could overcome his disabilities.

  f. As set forth in the factual allegations, upon information and belief, it was the deliberate choice of the administrators and supervisors not to enforce the implementation of the accommodations and to ensure that he had access to his internships, as a student with disabilities.

73. As a direct and proximate result of Defendant's deliberate indifference and intentional discrimination, it denied Mr. Cupitt the benefits of his program on the basis of his disability.

74. Wherefore, the Plaintiff prays for relief against Defendant as hereinafter set forth in the prayer for relief.

### Count 2
### DISCRIMINATION UNDER § 504 OF THE REHABILITATION ACT
*Jeffery Cupitt v. Philadelphia College of Osteopathic Medicine*

75. Mr. Cupitt hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

76. To establish a prima facie case under the §504 of the Rehabilitation Act ("RA")[2], a party must show: (a) they were a person with a disability; (b) they were otherwise qualified for participation in the program; (c.); the program they are challenging receives federal financial assistance; and (d.) they were subject to discrimination solely on the basis of their disability. *Hornstine v. Township of Moorestown,* 263 F. Supp. 2d 887, 905 (D.N.J 2003).

---

[2] *See* 29 U.S.C. § 794(a).

77. The Defendant University discriminated against, and denied Mr. Cupitt the benefits to his program, under the Rehabilitation Act:

    a. The Plaintiff is recognized as a person with disabilities, which includes, *inter alia*, narcolepsy.

    b. Upon information and belief, the University is a federal funds recipient and its buildings and facilities are places of public accommodation.

    c. Mr. Cupitt is otherwise qualified to participate in the program.

    d. The Defendant University denied Mr. Cupitt the benefits of his program in several ways, as set forth in ¶¶ 35-37; 56-68.

    e. This discrimination not only included, *inter alia*, the failure to work with Mr. Cupitt to develop an accommodation plan, it also included the University expelling him from the program and refusing to work with him on a remediation plan, so that he could overcome his disabilities.

    f. As set forth in the factual allegations, upon information and belief, it was the deliberate choice of the administrators and supervisors not to enforce the implementation of the accommodations and to ensure that he had access to his internships, as a student with disabilities.

78. As a direct and proximate result of Defendant's deliberate indifference and intentional discrimination, it denied Mr. Cupitt the benefits of his program on the basis of his disability.

79. Wherefore, the Plaintiff prays for relief against Defendant as hereinafter set forth in the prayer for relief.

## COUNT 3
## DISCRIMINATION UNDER THE CIVIL RIGHTS ACT OF 1964 ON THE BASIS OF RACE.

*Jeffery Cupitt v. Philadelphia College of Osteopathic Medicine*

80. Mr. Cupitt hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

81. Plaintiff alleges that the Defendant violated his rights under Title VI when it discriminate against him on the basis of his race when:

   a. 42 U.S.C. 2000d, which is Title VI of the Civil Rights Act of 1964, affirms, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

   b. The Defendant University is believed to be federal funds recipients.

   c. Mr. Cupitt is a Black student and, as such, is entitled to attend school absent race-based discrimination.

   d. The University subjected Mr. Cupitt to racially-discriminatory discrimination as set forth in ¶¶ 38-55; 62.

   e. As set forth in the factual allegations, upon information and belief, it was the deliberate choice of the administrators and supervisors not to take steps to remedy the racial discrimination, which Mr. Cupitt reported. ¶¶50-52; 54-55.

82. The Defendant University's conduct denied Mr. Cupitt access to the benefits of his education.

83. The Defendant's deliberate indifference to the ongoing racial discrimination is the direct and proximate cause of the Plaintiff's harm.

84. Wherefore, the Plaintiff prays for relief against Defendant as hereinafter set forth in the prayer for relief.

### COUNT 4
### DISCRIMINATION UNDER THE CIVIL RIGHTS ACT OF 1964 ON THE BASIS OF RELIGION
*Jeffery Cupitt v. Philadelphia College of Osteopathic Medicine*

85. Mr. Cupitt hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

86. Mr. Cupitt alleges that the Defendant discriminated against him on the basis of his religion:

    a. Mr. Cupitt is a member of the Muslim faith.

    b. Mr. Cupitt was qualified to be a graduate student at the University.

    c. The Brandywine School District subjected Mr. Cupitt to adverse treatment as set forth in ¶¶X46-55; 58-68, when it excluded him from the internship on the basis of his religion, when it did not permit him to wear his turban, and when it forced him to leave school grounds for wearing his turban.

    d. The University subjected Mr. Cupitt to adverse treatment as set forth in ¶¶46-55; 58-68, when it did not take steps to address the fact that the District was excluding him from the internship program on the basis of his religion.

    e. As set forth in the factual allegations, upon information and belief, it was the deliberate choice of the administrators and supervisors not to take steps to remedy the religious discrimination, which Mr. Cupitt reported. ¶¶ 38-55; 62.

87. The Defendant's conduct denied Mr. Cupitt access to the benefits of his education and internship on the basis of his religion.

88. The Defendant's deliberate indifference to the ongoing religious discrimination is the direct and proximate cause of the Plaintiff's harm.

89. Wherefore, the Plaintiff prays for relief against Defendant as hereinafter set forth in the prayer for relief.

## COUNT 6
## UNJUST ENRICHMENT
*Jeffery Cupitt v. Philadelphia College of Osteopathic Medicine*

90. Mr. Cupitt hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

91. Mr. Cupitt has paid more than $100,000 in tuition since enrolling in the program.

92. The University has dismissed Mr. Cupitt from the program and refuses to work with him to develop a plan for reinstatement.

93. The University, despite failing to comply with its own policies, and after dismissing Mr. Cupitt, is retaining the tuition he paid.

94. As a direct and proximate result of the University retaining Mr. Cupitt's tuition, it is being unjustly enriched.

95. As a direct and proximate result of Defendant retaining Mr. Cupitt's tuition, he has suffered economic losses.

96. Wherefore, the Plaintiff prays for relief against Defendant as hereinafter set forth in the prayer for relief.

## COUNT 7
**COMMON LAW DUE PROCESS/FUNDAMENTAL FAIRNESS**
*Jeffery Cupitt v. Philadelphia College of Osteopathic Medicine*

97. Mr. Cupitt hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

98. "The touchstone of due process is protection of the individual against arbitrary action[.]" *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). When a private institution, such as a private school, fulfills a public function, including student discipline, that institution owes its students a common law duty of due process.

99. The University fulfills a public function by undertaking the education of its students.

100. The University has set forth policies for reinstatement. (Exhibit "A.").

101. As pleaded in ¶¶59-67, the University refuses to comply with its own policies for reinstatement, which includes refusing to convene meetings with Mr. Cupitt, to provide feedback on the reinstatement plan, among other examples set forth in ¶¶59-67.

102. Per staff for Defendant's verbal instructions, he was to send his reinstatement plan, including the plan for remediation, to the Provost for reinstatement on or around May 21, 2024. Staff for Defendant verbally agreed to give Mr. Cupitt feedback and to work with him on the plan, but later stopped responding to his correspondence.

103. By refusing the following the reinstatement process, Mr. Cupitt has no way to complete his degree or, at minimum, to have the opportunity to do so.

104. The University's denial of fundamental fairness to Mr. Cupitt is the direct and proximate cause of his damages.

105. Wherefore, the Plaintiff prays for relief against Defendant as hereinafter set forth in the prayer for relief.

## DAMAGES

106. Plaintiff suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of all Defendants, in an amount that shall be proven at the time of trial. These damages include, but are not limited to: Damages for general pain and suffering; damages for the loss of enjoyment of life, both past and future; medical and medical-related expenses, both past and future; travel and travel-related expenses, both past and future; emotional distress, both past and future; pharmaceutical expenses, both past and future; loss of income and employment opportunities; and any and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Cupitt respectfully prays that the Court award him compensatory and restitutionary damages, and such other further relief that may deemed just and equitable, against all Defendants for, including, but not limited to, psychological treatment, lost wages, loss of future earnings, loss of enjoyment of life, emotional pain and suffering, interference with his civil rights, and reasonable attorneys' fees and costs of suit. Furthermore, Mr. Cupitt seeks any and all equitable relief, together with any and all remedies, that the Court deems just and appropriate, including ordering the University to reinstate him to the program, allowing him to

resume his program with his current credits and to complete any degree requirements; to implement his 504 plan with fidelity, and removing any and all contested grades from his file, resulting from the University failure to implement his accommodations.

## **DEMAND FOR A JURY TRIAL**

In accordance with federal law, Mr. Cupitt hereby demands a trial by jury on all appropriate issues.

Respectfully submitted,

MONTGOMERY LAW, PLLC
1420 Locust Street, Suite 420
Philadelphia, PA 19102
***Attorneys for Plaintiff***

By: */s/ Bradley R. Flynn*

Bradley R. Flynn, Esq.
PA Bar ID: 332730

By: */s/ Kyle Anthony Adams*

Kyle Anthony Adams, Esq
PA Bar ID: 332876

Dated: January 20, 2025

MONTGOMERY LAW GROUP
Bradley R. Flynn, Esq.
PA Bar ID: 332730
1420 Locust Street, Suite 420
Philadelphia, PA 19012
Phone: 215-650-7563
Bradley@ed-law.com

### IN THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Jeffery Cupitt, Individually,<br>*Plaintiffs*,<br><br>V.<br><br>The Philadelphia College of<br>Osteopathic Medicine<br>*Defendant*. | Case No.  2:25-cv-00324 |

### **PLAINTIFFS' VERIFICATION**

I, Jeffery Cupitt, the named Plaintiff in the above-captioned case, declare under the penalty of perjury, that the foregoing civil complaint is true and correct.

*Jeffery L Cupitt III*
_____
Jeffery Cupitt, Plaintiff



Executed on: December 20, 2025.